# EXHIBIT A

# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
### SUPERIOR COURT

Rockingham Superior Court
Rockingham Cty Courthouse/PO Box 1258
Kingston NH  03848-1258

Telephone: 1-855-212-1234
TTY/TDD Relay: (800) 735-2964
http://www.courts.state.nh.us

## FOR SERVICE

## SUMMONS IN A CIVIL ACTION

Case Name:     **Martin T Quigley v Precision Castparts Corp., et al**
Case Number:   **218-2016-CV-00015**

Date Complaint Filed: January 06, 2016

A Complaint has been filed against Kenneth Buck; Emi Donis; Joshua Durand; John Ericksen; Brian Keegan; PCC Structurals, Inc.; Precision Castparts Corp.; Kevin Stein; Michael Walter; Wyman-Gordon Investment Castings, Inc.; Charles Zwick in this Court. A copy of the Complaint is attached.

**The Court ORDERS that ON OR BEFORE:**

| | |
|---|---|
| February 22, 2016 | Martin T Quigley shall have this Summons and the attached Complaint served upon Kenneth Buck; Emi Donis; Joshua Durand; John Ericksen; Brian Keegan; PCC Structurals, Inc.; Precision Castparts Corp.; Kevin Stein; Michael Walter; Wyman-Gordon Investment Castings, Inc.; Charles Zwick by in hand or by leaving a copy at his/her abode, or by such other service as is allowed by law. |
| March 14, 2016 | Martin T Quigley shall file the return(s) of service with this Court. Failure to do so may result in this action being dismissed without further notice. |
| 30 days after Defendant is served | Kenneth Buck; Emi Donis; Joshua Durand; John Ericksen; Brian Keegan; PCC Structurals, Inc.; Precision Castparts Corp.; Kevin Stein; Michael Walter; Wyman-Gordon Investment Castings, Inc.; Charles Zwick must file an Appearance and Answer or other responsive pleading form with this Court.   A copy of the Appearance and Answer or other responsive pleading must be sent to the party listed below and any other party who has filed an Appearance in this matter. |

**Notice to Kenneth Buck; Emi Donis; Joshua Durand; John Ericksen; Brian Keegan; PCC Structurals, Inc.; Precision Castparts Corp.; Kevin Stein; Michael Walter; Wyman-Gordon Investment Castings, Inc.; Charles Zwick:** If you do not comply with these requirements you will be considered in default and the Court may issue orders that affect you without your input.

Send copies to:
   Joseph R. Russell, ESQ

Kalil & LaCount
681 Wallis Road
Rye NH  03870

Received for
DOCKETING

FEB 1 0 16

By:_____

BY ORDER OF THE COURT

NHJB-2678-S (10/23/2013)

THE STATE OF NEW HAMPSHIRE

ROCKINGHAM, SS                                    SUPERIOR COURT

MARTIN T. QUIGLEY
132 Woodland Road
North Hampton, New Hampshire 03862

v.

PRECISION CASTPARTS CORP.
4650 SW Macadam Avenue, Suite 400
Portland, Oregon 97239

WYMAN-GORDON INVESTMENT CASTINGS, INC.
839 Poquonnock Road
Groton, Connecticut 06340

PCC STRUCTURALS, INC.
4600 SE Harney Drive
Portland, Oregon 97206

KENNETH BUCK
10273 N 107th Street
Scottsdale, Arizona 85258

EMI DONIS
3915 SW Altadena Avenue
Portland, Oregon 97239

JOSHUA DURAND
53 Putney Road
Bow, New Hampshire 03304

JOHN ERICKSEN
16 Connelly Hill Road
Hopkinton, Massachusetts 01748

BRIAN KEEGAN
4301 NE Laurelhurst Place
Portland, Oregon 97213

KEVIN STEIN
101 Pheasant Lane
Chagrin Falls, Ohio 44022

1

MICHAEL WALTER
3830 West County Road
Berthoud, CO 80513

CHARLES ZWICK
9963 SE Nancy Court
Happy Valley, Oregon 97086

DOE DEFENDANTS 1 through 10
Addresses Unknown

## VERIFIED COMPLAINT

NOW COMES the Plaintiff, Martin T. Quigley, by and through his attorneys, Kalil & LaCount and Preti Flaherty Beliveau & Pachios, LLP, and hereby complains against the Defendants as follows:

## PARTIES

1.      The Plaintiff, Martin T. Quigley, is an individual residing at 132 Woodland Road, North Hampton, New Hampshire 03862 (the "Plaintiff").

2.      At all relevant times, the Plaintiff was a resident of New Hampshire.

3.      The Defendant, Precision Castparts Corp., is an Oregon corporation with a principal place of business of 4650 SW Macadam Avenue, Suite 400, Portland, Oregon 97239 (the "Defendant PCC").

4.      The Defendant PCC employs in excess of fifty (50) employees.

5.      The Defendant, Wyman-Gordon Investment Castings, Inc., is a Delaware corporation, registered to do business in the State of New Hampshire, with a principal place of business of 839 Poquonnock Road, Groton, Connecticut 06340 (the "Defendant Wyman").

6.      The Defendant Wyman employs in excess of fifty (50) employees.

7.      The Defendant Wyman is a wholly owned subsidiary of the Defendant PCC.

8.      The Defendant, PCC Structurals, Inc., is an Oregon corporation, with a principal place of business of 839 Poquonnock Road, Groton, Connecticut 06340 (the "Defendant Structurals", and, together with Defendant PCC and Defendant Wyman, the "Corporate Defendants").

9.      The Defendant Structurals operates a facility in Tilton, New Hampshire.

10.      The Defendant Structurals employs in excess of fifty (50) employees.

2

11.      The Defendant Structurals is a wholly owned subsidiary of the Defendant PCC.

12.      The Defendant, Kenneth Buck, is an individual believed to be residing at 10273 N 107th Street, Scottsdale, Arizona 85258 (the "Defendant Buck").

13.      During all relevant times, Defendant Buck was the President of Defendant PCC's "Forged Products Division", of which Defendant Wyman was a part.

14.      The Defendant, Emi Donis, is an individual believed to be residing at 3915 SW Altadena Avenue, Portland, Oregon 97239 (the "Defendant Donis").

15.      At all relevant times, Defendant Donis was the Assistant General Counsel of Defendant PCC.

16.      The Defendant, Joshua Durand, is an individual believed to be residing at 53 Putney Road, Bow, New Hampshire (the "Defendant Durand").

17.      At all relevant times, Defendant Durand was the Human Resource Manager of Defendant Structurals.

18.      The Defendant, John Ericksen, is an individual believed to be residing at 16 Connelly Hill Road, Hopkinton, Massachusetts 01748 (the "Defendant Ericksen").

19.      At all relevant times, Defendant Ericksen was Senior Vice President of Defendant PCC.

20.      The Defendant, Brian Keegan, is an individual believed to be residing at 4301 NE Laurelhurst Place, Portland, Oregon (the "Defendant Keegan").

21.      At all relevant times, Defendant Keegan was Senior Corporate Director, Employee Relations of Defendant PCC.

22.      The Defendant, Kevin Stein, is an individual believed to be residing at 101 Pheasant Lane, Chagrin Falls, Ohio 44022 (the "Defendant Stein").

23.      At all relevant times, Defendant Stein was the President of Defendant Structurals and Executive Vice President of Defendant PCC.

24.      The Defendant, Michael Walter, is an individual believed to be residing at 3830 West County Road, Berthoud, Colorado (the "Defendant Walter").

25.      At all relevant times, Defendant Walter was the President of Defendant Wyman.

26.     The Defendant, Charles Zwick, is an individual believed to be residing at 9963 SE Nancy Court, Happy Valley, Oregon (the "Defendant Zwick").

27.     At all relevant times, Defendant Zwick was the Vice President of Human Resources of Defendant Structurals.

28.     The true names and capacities, whether individual, corporate, or otherwise, of the Defendants sued as Doe Defendants 1 through 10 are unknown to the Plaintiff who therefore sues them by their fictitious names. At such times as their true names and capacities are ascertained, the Plaintiff will seek leave of Court to amend this Complaint accordingly. On information and belief, each of the Doe Defendants 1 through 10 was the subsidiary, agent, representative, director, manager, principal, contractor, stockholder, officer, or employee of the Corporate Defendants and was acting at all times within the scope of his, her or its agency, representative capacity or employment and with the full knowledge and consent of the Corporate Defendants and that each of the Doe Defendants 1 through 10 are liable to the Plaintiff, individually, in connection with one or more of the claims sued upon herein and are responsible in some manner for the wrongful acts and conduct alleged herein.

## FACTS COMMON TO ALL COUNTS

### Plaintiff's Relocation Request was prompted by a hostile workplace.

29.     The Plaintiff was employed by Defendant Wyman from April 2012 to March 2014 at its Cleveland, Ohio facility as Vice President of Sales.

30.     During his time at Defendant Wyman's Cleveland facility, Plaintiff was routinely subjected to verbal abuse by his superiors, Defendant Walter and Defendant Buck.

31.     Plaintiff also witnessed Defendant Walter and Defendant Buck verbally abuse other employees and the Defendant Walter physically abuse another employee. As both a victim and a witness of the abusive actions of Defendant Walter and Defendant Buck, Plaintiff was in a near constant state of stress which caused him significant physical and psychological harm.

32.     On or about January 30, 2014, Plaintiff requested that his office be changed to Defendant Wyman's Millbury, Massachusetts location.

33.     This relocation request was in part to escape the well-known abusive actions of Defendant Walter and Defendant Buck.

34.     Rather than simply accommodating Plaintiff's request for a transfer, Defendant PCC required Mr. Quigley to undergo internal interviews and testing before reassigning him to Defendant Structurals' Tilton, New Hampshire location.

35.     Upon learning of the Plaintiff's request to transfer, the Defendant Buck retaliated against Plaintiff by disparaging him to other employees and went as far as locking

Plaintiff out of the building so that Plaintiff was unable to move his personal effects to his new workplace.

36.     By letter dated February 20, 2014, Plaintiff was offered and accepted the job of Vice President of Sales & Marketing for Defendant Structurals. See copy of Offer Letter attached as <u>Exhibit A</u>.

37.     As a condition of his transfer, Defendant Structurals required Plaintiff to sign a probation agreement.

38.     As part of the offer accepted by Plaintiff, Plaintiff was to receive a raise upon completion of the probationary period, an office at a facility in Millbury, Massachusetts, reimbursement for travel to and from the Millbury office and a lump sum payment of $3,500.00 for moving expenses.

39.     Plaintiff agreed to these contractual conditions based upon the representations made in the Offer Letter and effective March 3, 2014, Plaintiff was named Vice President of Sales & Marketing of Defendant Structurals.

### The Continued Hostile Workplace led to even higher levels of stress and anxiety, and generally poor physical and emotional health.

40.     Despite his transfer to a separate division and Plaintiff's well-known abuse by Defendant Buck, Plaintiff was required to work with Defendant Buck on certain projects during which Defendant Buck continued his verbal abuse of Plaintiff.

41.     By letter dated July 22, 2014, Plaintiff was unconditionally released from probation by Defendant Zwick; however, despite being released from probation, Plaintiff did not receive the raise promised in the Offer Letter. *See* Probation Release Letter attached hereto as <u>Exhibit B</u>.

42.     Further, despite being promised office space and mileage in his offer letter, both his office and his reimbursement for travel were taken away without cause.

43.     During his time working for the Corporate Defendants, Plaintiff was routinely coerced into partaking in business practices that he found unethical and illegal; including but not limited to extortion of customers, sale of unqualified products, insurance fraud and price fixing schemes, to wit:

      a.  The Corporate Defendants pressured the Plaintiff to "leverage" customers whereby the Corporate Defendants would routinely instruct Plaintiff to threaten customers, including but not limited to NPO Saturn, in order to procure sales orders or favorable contracts;

      b.  The Corporate Defendants also involved Plaintiff in the sale of "unqualified" products, which upon information and belief failed to meet

technical specifications, to customers such as MTU Friedrichshafen GmbH;

c. The Corporate Defendants, through the Defendant Walter and the Defendant Buck, instructed the Plaintiff to obtain a letter from Samsung which was to be used in a scheme to file a fraudulent insurance claim; and

d. The Corporate Defendants involved the Plaintiff in a plan to fix prices related to GE commercial aircraft engines.

44.     The Plaintiff felt that his failure to acquiesce to the directives of the Corporate Defendants, the Defendant Walter and the Defendant Buck would result in his firing.

45.     Many executives at Corporate Defendants condoned this behavior, including the verbal and physical abuse, as being a part of the culture of the Corporate Defendants, going so far as to term Defendant PCC as a "full contact company" and passing out coffee mugs with Defendant PCC's logo and the phrase "It's NOT For Everyone".

46.     During his time working for the Corporate Defendants, Plaintiff was expected to maintain a rigorous travel schedule and to be available at all hours.

47.     Based upon the hostile work environment to which he was subjected, and in particular the events of the previous seven (7) months since he requested the transfer, Plaintiff was suffering from high levels of stress and anxiety.

48.     In July 2014, Plaintiff consulted his gastroenterologist, Steven P. Bensen, M.D. ("Dr. Bensen"), and asked whether a six month leave of absence would alleviate his health problems.  Plaintiff knew the Corporate Defendants had offered such leave to other executives in the past.  Dr. Bensen concurred that a leave might be beneficial, and advised Plaintiff to avoid stressful environments and excessive travel during such a six month leave of absence.

49.     Plaintiff's primary care physician, Karen Palmer, M.D. ("Dr. Palmer"), concurred that a leave of absence would be beneficial to Mr. Quigley's overall physical and mental health.

50.     Dr. Palmer also referred Plaintiff to a mental health professional, Richard Carr, M. Ed., L.C.M.H.C.

51.     Both Dr. Bensen and Dr. Palmer believed that the hostile work environment was a contributing factor in Plaintiff's poor physical and mental health.

## Plaintiff was intentionally misled about the availability of a Leave of Absence for Medical Reasons

52.     After taking a previously scheduled vacation August 10, 2014 through August 15, 2014, during which he contemplated his health and the possibility a leave of absence might

help, on August 18, 2014, Plaintiff contacted Defendant Ericksen to discuss his ongoing physical and mental health issues and to request a leave of absence.

53.     While Defendant Ericksen was not Plaintiff's direct supervisor at the time, given the sensitive nature of Plaintiff's request, Plaintiff felt most comfortable discussing his condition with Defendant Ericksen.

54.     Following an in-person meeting with Defendant Ericksen, the leave request was granted and Plaintiff was assured by Defendant Ericksen that Plaintiff had the full support of the Corporate Defendants.

55.     Defendant Ericksen further assured Plaintiff that his condition would only be disclosed to other high ranking executives and relevant members of the Corporate Defendants' respective human resources departments.

56.     Despite these assurances, on information and belief, the Defendants disclosed Plaintiff's protected health information to other employees, to customers, and to others in the aerospace industry.

57.     Such disclosure by the Defendants humiliated Plaintiff and severely impeded his ability to find alternate employment in the aerospace industry and his ability to continue to earn the substantial pay and benefits he earned with Corporate Defendants.

58.     On information and belief, the Defendants conspired to terminate Plaintiff's employment as they saw Plaintiff's request for leave as a signal of his no longer being a "team member" and that he was likely to report the Defendants' bad acts to the relevant authorities.

59.     Plaintiff was told by Defendant Keegan that he qualified for twelve (12) weeks of short-term disability coverage through the Family and Medical Leave Act ("FMLA"); and also, that he qualified for disability coverage for up to six (6) months through a policy the Corporate Defendants maintained with Cigna.

60.     Plaintiff was happy to hear this as the promised leave time corresponded to the length of time which his doctors recommended.

61.     Plaintiff was soon contacted by Cigna to complete the disability coverage process.

62.     Plaintiff subsequently invested large amounts of time and money to comply with Cigna's numerous and expansive requests for information only to be told that the Corporate Defendants, Defendant Durand and Defendant Keegan, had all misinformed Plaintiff about Plaintiff's eligibility for coverage under the Cigna disability policy.  Cigna therefore denied Plaintiff any disability coverage.

63.     What should have been a straight-forward process turned into an expensive, stressful, and ultimately futile two-month long process which also caused Plaintiff further emotional and physical distress and significant out-of-pocket expenses.

64.     Plaintiff expressed his frustration with the process and the stress it caused him to Defendant Keegan on multiple occasions.

65.     By letter dated October 31, 2014, Mary Lonergan, Benefits Manager of Defendant PCC ("Lonergan"), informed Plaintiff that his request for disability benefits was also denied under a non-Cigna, company-administered policy.

66.     Lonergan also informed Plaintiff that his FMLA leave was set to expire on November 9, 2014 and that he would "need to discuss [his] employment status with [Defendant] Ericksen."

### Plaintiff Attempted to Return to Work but was dismissed following a sham investigation.

67.     Plaintiff contacted Defendant Ericksen to arrange for his return to work as instructed; however, Plaintiff was told not to report back to work by Defendant Ericksen.

68.     On information and belief, the Defendants had jointly decided to conduct a sham investigation in order to force the Plaintiff from his job and to prevent him from becoming a whistleblower.

69.     By letter dated November 10, 2014, Defendant Donis indicated that Plaintiff was placed on unpaid leave status "pending…investigation into suspected violations of his probationary agreement."

70.     At no point prior to the Plaintiff making clear his intention to return to work had anyone at the Corporate Defendants raised any issues with Plaintiff's compliance with the terms of the probationary agreement.

71.     On the contrary, Defendant Zwick unconditionally released Plaintiff from said probationary agreement, and Defendant Zwick and Defendant Stein offered positive comments on Plaintiff's performance.

72.     Defendant Donis advised that the Corporate Defendants wanted Plaintiff to fly to corporate headquarters in Portland, Oregon to be interviewed as part of an internal investigation.

73.     Plaintiff requested that the "interview" be conducted at either Defendant Wyman's Millbury, Massachusetts location or its Tilton, New Hampshire location as these were the offices to which Plaintiff was assigned.

74.     Plaintiff also requested a list of questions that Corporate Defendants planned to ask Plaintiff.

75.     Both of these requests were refused.

76.     Plaintiff believes that the outcome of the "investigation" had already been determined.

77.     By letter dated December 10, 2014, as expected, Corporate Defendants terminated Plaintiff's employment.

78.     In said letter, Corporate Defendants cited three (3) reasons for Plaintiff's termination, all of which contained factual inaccuracies and/or fabrications. *See* Termination Letter attached hereto as <u>Exhibit C</u>.

79.     On information and belief, Corporate Defendants conducted a sham investigation as a pretext for their firing of Plaintiff, which was always their intention once he requested a leave of absence and they decided he was a risk to them as a non-team player.

80.     As a direct and foreseeable consequence of the Defendants' actions, Plaintiff's job prospects within the aerospace industry, an industry in which he has been employed the majority of his working life, irreparably harmed and, as a result, his earning potential for the remainder of his life has been severely impacted.

81.     Due to the unlawful actions of the Defendants, Plaintiff suffered and continues to suffer damages within the jurisdictional limits of the Court.

COUNT I
<u>Wrongful Termination – Bad Faith</u>
<u>(Defendant PCC and Defendant Structurals)</u>

82.     The facts alleged in Paragraphs 1 through 81 are incorporated in this Count I by reference as if fully set forth herein.

83.     The Plaintiff would not have been terminated from Defendant Structurals had he continued to be a willing participant in the Defendants' bad acts including but not limited those referenced in Paragraph 43 *supra*.

84.     The Defendant PCC and Defendant Structurals were motivated by bad faith in terminating Plaintiff's employment because he was a likely whistleblower.

85.     The Plaintiff has been harmed as a direct and proximate result of the Defendant PCC and Defendant Structurals' bad faith termination of his employment and he is entitled to and hereby demands all damages resulting from said retaliatory termination of his employment, including, but not limited to, back and front pay, punitive, compensatory, consequential and incidental damages, interest, and Plaintiff's costs.

9

COUNT II<br>
<u>Wrongful Termination – Retaliation</u><br>
<u>(Defendant PCC and Defendant Structurals)</u>

86.     The facts alleged in Paragraphs 1 through 85 are incorporated in this Count II by reference as if fully set forth herein.

87.     The Plaintiff would not have been terminated from Defendant Structurals had he not requested a leave of absence.

88.     The Defendant PCC and Defendant Structurals were motivated by bad faith, malice, and retaliation in terminating Plaintiff's employment because he requested a leave of absence.

89.     The Plaintiff has been harmed as a direct and proximate result of the Defendant PCC and Defendant Structurals' retaliatory termination of his employment and he is entitled to and hereby demands all damages resulting from said retaliatory termination of his employment, including, but not limited to, back and front pay, punitive, compensatory, consequential and incidental damages, interest, and Plaintiff's costs.

COUNT III<br>
<u>Breach of Contract</u><br>
<u>(Corporate Defendants)</u>

90.     The facts alleged in Paragraphs 1 through 89 are incorporated in this Count III by reference as if fully set forth herein.

91.     Corporate Defendants made various promises to the Plaintiff concerning his rate of pay and working conditions upon which Plaintiff relied and which induced Plaintiff into employment with Corporate Defendants. See Offer Letter attached hereto as <u>**Exhibit A**</u>.

92.     Corporate Defendants failed to fulfill the promises made to Plaintiff including but not limited to his office in Millbury, Massachusetts, his travel schedule and his rate of pay.

93.     The Plaintiff has been harmed as a direct and proximate result of the Defendants' breach of contract and he is entitled to and hereby demands all damages resulting from said breach, including, but not limited to, back and front pay, punitive, compensatory, consequential and incidental damages, interest, and Plaintiff's costs.

COUNT IV<br>
<u>Breach of Implied Covenant of Good Faith and Fair Dealing</u><br>
<u>(Corporate Defendants)</u>

94.     The facts alleged in Paragraphs 1 through 93 are incorporated in this Count IV by reference as if fully set forth herein.

10

95.     Every contract contains within it an implied covenant of good faith and fair dealing.

96.     Defendant PCC and Defendant Structurals breached this implied covenant by conducting a sham investigation with the sole purpose of finding pretext to terminate Plaintiff's employment.

97.     The Plaintiff has been harmed as a direct and proximate result of the Defendants' breach of the implied covenant of good faith and fair dealing and he is entitled to and hereby demands all damages resulting from said Defendants' breach, including, but not limited to, back and front pay, punitive, compensatory, consequential and incidental damages, interest, and Plaintiff's costs.

**COUNT V**
**Breach of Fiduciary Duty**
**(All Defendants)**

98.     The facts alleged in Paragraphs 1 through 97 are incorporated in this Count V by reference as if fully set forth herein.

99.     Defendant Ericksen, on behalf of the Defendant PCC and Defendant Structurals, assured Plaintiff that his diagnoses would not be disclosed to anyone not required to know for disability insurance related human resources reasons and therefore assumed a duty on behalf of Defendant PCC and Defendant Structurals to protect Plaintiff's health information, including his diagnoses.

100.    To the extent that the reasons for Plaintiff's leave of absence were made known to other employees of Corporate Defendants, to clients or customers of Corporate Defendants and to the aerospace industry as a whole, the Defendants breached their fiduciary duty to protect Plaintiff's health information.

101.    This information, which may or may not have been accurate, was at least private. The release of the information to others in the industry has irreparably damaged Plaintiff's ability to get another job.

102.    The Plaintiff has been harmed as a direct and proximate result of the Defendant PCC and Defendant Structurals' breach of their fiduciary duty to protect Plaintiff's health information and he is entitled to and hereby demands all damages resulting from said Defendants' breach, including, but not limited to, back and front pay, punitive, compensatory, consequential and incidental damages, interest, and Plaintiff's costs.

**COUNT VI**
**Civil Conspiracy**
**(All Defendants)**

103.    The facts alleged in Paragraphs 1 through 102 are incorporated in this Count VI by reference as if fully set forth herein.

11

104.     The Defendants agreed to act in concert to unlawfully terminate Plaintiff's employment with Corporate Defendants by conducting a sham investigation, led by the Defendant Donis, with the goal of manufacturing justification for terminating the employment of Plaintiff.

105.     The Defendants did act in concert and solicited from employees of Corporate Defendants factually inaccurate accounts or fabrications of acts alleged to have been committed by Plaintiff.

106.     The non-corporate defendants, and in particular Defendant Walter and Defendant Buck who harassed and abused Plaintiff, acted in their own personal interests in participating in the conspiracy.

107.     Any employee of the Corporate Defendants that refused to assist the Corporate Defendants in manufacturing justification to terminate Plaintiff's employment would be ostracized and face a fate similar to the Plaintiff; therefore, by participating in the conspiracy each such non-corporate defendant was also acting in his or her own personal interests.

108.     The Plaintiff has been harmed as a direct and proximate result of the Defendants' civil conspiracy and he is entitled to and hereby demands all damages resulting from said Defendants' civil conspiracy, including, but not limited to, back and front pay, punitive, compensatory, consequential and incidental damages, interest, and Plaintiff's costs.

## COUNT VII
### Fraudulent Misrepresentation
### (Defendant PCC and Defendant Structurals)

109.     The facts alleged in Paragraphs 1 through 108 are incorporated in this Count VII by reference as if fully set forth herein.

110.     The Defendant PCC and Defendant Structurals intentionally misrepresented Plaintiff's eligibility for disability benefits through Cigna.

111.     These misrepresentations were made with knowledge of their falsity or reckless disregard for their truth.

112.     Plaintiff reasonably relied on the misrepresentations made by the Defendant PCC and the Defendant Structurals regarding his eligibility for disability benefits through Cigna.

113.     Upon information and belief, the Defendant PCC and the Defendant Structurals intentionally misinformed Plaintiff that he was eligible for disability through Cigna in order to delay their formal denial of Plaintiff's disability request under the company-administered policy which would allow time for a cause for Plaintiff's termination of employment to be manufactured.

114.     As a direct, proximate and foreseeable result of the misrepresentations of Defendant PCC and Defendant Structurals, Plaintiff suffered damages in an amount within the jurisdictional limits of this Court.

## COUNT VIII
### Negligent Misrepresentation
### (Defendant PCC and Defendant Structurals)

115.     The facts alleged in Paragraphs 1 through 114 are incorporated in this Count VIII by reference as if fully set forth herein.

116.     The Defendant PCC and Defendant Structurals negligently misrepresented that Plaintiff qualified for disability benefits through Cigna.

117.     Upon information and belief, said misrepresentations were made without taking reasonable care as to their truth or accuracy.

118.     Plaintiff reasonably relied on said misrepresentations of Defendant PCC and Defendant Structurals.

119.     As a direct, proximate and foreseeable result of the misrepresentations of Defendant PCC and Defendant Structurals, Plaintiff suffered damages in an amount within the jurisdictional limits of this Court.

## COUNT IX
### Intentional Infliction of Emotional Distress
### (All Defendants)

120.     The facts alleged in Paragraphs 1 through 119 are incorporated in this Count IX by reference as if fully set forth herein.

121.     Defendants, and each of them individually, engaged in outrageous conduct towards Plaintiff, with the intention to cause or with reckless disregard for the probability of causing Plaintiff to suffer severe emotional distress. To the extent that said outrageous conduct was perpetrated by certain Defendants, the remaining Defendants adopted and ratified said conduct with a wanton and reckless disregard of the deleterious consequences to Plaintiff.

122.     The Plaintiff has suffered and continues to suffer extreme mental distress, humiliation, anguish, and emotional and physical injuries, as well as economic losses as a direct and proximate result of said conduct of the Defendants, and each of them individually, and Plaintiff is entitled to and hereby demands damages, including punitive damages.

## COUNT X
### Negligent Infliction of Emotional Distress
### (All Defendants)

123.    The facts alleged in Paragraphs 1 through 122 are incorporated in this Count X by reference as if fully set forth herein.

124.    All Defendants, and each of them, knew or reasonably should have known that the conduct described herein would and did proximately result in physical and emotional distress to Plaintiff. At all relevant times, all Defendants, and each of them, had the power, ability, authority, and duty to stop engaging in the conduct described herein and/or to intervene to prevent or prohibit said conduct.

125.    Despite said knowledge, power, and duty, Defendants negligently failed to act so as to stop the conduct described herein and/or to prevent or prohibit such conduct or otherwise protect Plaintiff.

126.    To the extent that said negligent conduct was perpetrated by certain Defendants, the remaining Defendants confirmed and ratified said conduct by their inaction, and with a wanton and reckless disregard for the deleterious consequences to Plaintiff

127.    The Plaintiff has suffered and continues to suffer extreme mental distress, humiliation, anguish, and emotional and physical injuries, as well as economic losses as a direct and proximate result of said negligence of the Defendants, and each of them individually, and Plaintiff is entitled to and hereby demands damages, including punitive damages.

### RELIEF REQUESTED

WHEREFORE, the Plaintiff respectfully request that this Honorable Court:

A.    Award Plaintiff his damages, including but not limited to compensatory, consequential, punitive and incidental damages;

B.    Award Plaintiff interest, costs and attorneys' fees; and

C.    Grant the Plaintiff such other and further relief as may be just and appropriate.


### THE PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES

Respectfully Submitted,

MARTIN T. QUIGLEY

By his attorneys,
KALIL & LaCOUNT

Dated: December 22, 2015          By: _____

Earl L. Kalil, Jr. (#1978)
Joseph R. Russell (#18653)
681 Wallis Road
Rye, NH 03870
(603) 964-1414


PRETI FLAHERTY BELIVEAU &
PACHIOS, LLP

Dated: December 22, 2015          By: _____

William C. Saturley (#2256)
P.O. Box 1318
Concord, NH 03302-1318
(603) 410-1557

15

## VERIFICATION

I, Martin T. Quigley, have personal knowledge of the facts alleged in this Verified Complaint and hereby verify and state, upon my oath, that the facts alleged herein are true and accurate to the best of my knowledge and belief.

Dated:  December 22, 2015

_____
Martin T. Quigley

STATE OF NEW HAMPSHIRE
COUNTY OF ROCKINGHAM

Personally appeared the above named Martin T. Quigley, the person signing the above Verification, and swore that it is true to the best of his knowledge and belief.

Dated:  December 22, 2015

_____
Joseph R. Russell, Justice of the Peace
My Commission Expires: October 2

EXHIBIT A

# PCC Structurals, Inc.

February 20, 2014

Mr. Martin Quigley

Dear Martin,

It is with great pleasure I write to you confirming PCC Structurals ("PCC Structurals", "The Company", or "PCC") offer of six-month probationary employment, serving as Vice President of Sales & Marketing, reporting to me. Your six-month probationary period will begin on March 3, 2014 (when you will be transferred from the PCC Forged Products Group to PCC Structurals, Inc.), and end on August 1, 2014.

We believe that we can challenge your current skills while offering you the opportunity to continue to grow professionally. We value results and believe that employees should share in our overall success and be recognized for their contributions. We offer you the following compensation:

- You will be compensated at your current salary of $199,500 with an Executive Bonus (EB) level of 60%. No retroactive salary will be paid in connection with a purported misunderstanding regarding your compensation while employed at Forged Products. Upon the satisfactory completion of your six-month probationary employment period, (terms for "satisfactory completion" will be reviewed and contain mutually agreed upon objectives as defined by me) your base compensation will be adjusted to $210,000 and 70% EB.

- You will be provided with an office in Millbury, MA. and you will receive your pay from the PCC Structurals, Inc.-Tilton facility located in New Hampshire. You will be reimbursed for mileage traveled from your home residence in NH to Millbury, MA.

- You are offered full participation in a comprehensive group benefits program designed for your current and future financial security, as outlined and commensurate of coverage with the employees of our PCC Structurals, Inc.-Tilton facility. These benefits are described in more detail in the attached Group Benefit Summary.

- Your seniority and any accrued but unused benefits will carry over to PCC Structurals from Forged Products.

- During your six-month probationary period you will have 10 days of accrued vacation.

- The Company will provide a lump sum relocation payment of $3,500.00 to be used to cover expenses associated with your relocation from Cleveland to New England. You are not to

submit any additional expenses for the trip including, without limitation, gas, meals and hotel. You can however, submit the expense for coach air fare to Cleveland, should you choose to fly. This payment is considered income and is subject to normal tax withholding. Check with your tax advisor on whether your expenses are deductible.

This offer is subject to the following:

- You will need to take a pre-promotion chemical screening before or during your first week of employment. Failure to satisfactorily pass this chemical screen will rescind this offer.

Please note that, while we expect this will be a successful and mutually rewarding employment relationship, employment with PCC Structurals is "at will" and may be terminated at any time for any reason either you or the Company considers appropriate.

Please acknowledge your acceptance of this offer in the space provided below and return a signed copy to me for our records.

Sincerely,

Kevin Stein
President
PCC Structurals, Inc.

I hereby accept this offer as outlined above.

NAME: Martin Quigley                    Date:



Mr. Martin Quigley
*Sent via email to mquigley@wyman.com*

Dear Martin,

The purpose of this letter is to set forth the terms and conditions of your six-month probationary employment period with PCC Structurals, Inc. (the "Company") to begin on March 3, 2014 and end on August 1, 2014. At the conclusion of this period, you understand and agree that the Company will decide in its sole discretion whether to continue or terminate the employment relationship. Notwithstanding this six-month probationary period, you further acknowledge and agree that you are employed by the Company at all times on an at-will basis, meaning that the Company or you may end the employment relationship at any time, for any reason or no reason, and with or without prior notice. The terms and conditions of your probationary employment are as follows:

<u>Job Duties and Responsibilities:</u> Your work time will be split between customer visits, the Millbury office and at least one week each month in Portland. The initial scope of your position covers the Structurals Castings Division only as its Commercial Director. You are expected to collaborate appropriately with other related PCC operations, but they do not report to you. During this six-month period the focus needs to be on learning the people and products of the Structurals Castings plants. The scope of your position will be reviewed on or before August 1, 2014.

<u>Additional Terms and Conditions of Employment:</u> The following additional terms and conditions must be strictly adhered to at all times during your employment. Failure to comply is grounds for immediate termination.

1) All of you expense reports are to be turned into Chuck Zwick, the Company VP of HR. All domestic air travel is to be coach, and international travel will be business economy. Only in the event that business economy is unavailable, are you authorized to use standard business class (and you must submit proof of the unavailability of business economy with your expense report (e.g., an email from Uniglobe)). All travel is to be booked through Linda Sanderski at Uniglobe. Hotel choices, restaurant selections, ground transportation choices and additional days/weekends taken for travel will all be factors that are closely scrutinized by the Company. You will be held to comply with the prudent spending behaviors consistent with PCC culture. Should non-work days be included in business trips you will not charge the Company for your expenses on those days and you will use vacation time for any work week days ( Monday – Friday) you are not working or traveling.

2) You will refrain from all inappropriate personal conversations with coworkers and subordinates. Over-sharing of your own detailed personal matters has made other PCC employees very uncomfortable and this activity will cease immediately.

3) You will accurately represent your role with customers and PCC employees. To be clear, you are responsible for PCC Structurals Castings Sales and nothing else until that is changed explicitly and in writing by either Kevin Stein or Steve Hackett. You are expected to assist Carlton Forge

Page 1 of 2

Works and any other PCC-owned companies as requested and without debate over reporting relationships.

4) You will not engage in any recruiting activity directly and in particular from any former employer. You will turn over all recruiting activities to either Chuck Zwick for Structurals Castings candidates; or John Ericksen for candidates that might fit elsewhere at PCC. Any referral of talented candidates should be provided to Chuck Zwick or John Ericksen and must not violate any contractual obligation.

5) You will communicate with me before all customer visits to remain calibrated with my direction at all times and you will not step outside of the authority I give you without my prior approval.

6) You will re-read the PCC Code of Conduct prior to March 3rd and by your signature below, you acknowledge your understanding that 100% compliance with the PCC Code of Conduct is non-negotiable and a firm condition of continued employment. You must pay particular attention to, and strictly comply with, the section of the Code that addresses PCC's intellectual property.

These employment terms and conditions have been generated in response to your performance history in the Forged Products Group. It is imperative that you carefully read these employment terms and conditions, and fully understand and agree to a zero-tolerance policy applied to any recurrence of these items or any items that in the judgment of PCC compromises our high ethical standards.

Sincerely,

Kevin Stein
President
PCC Structurals, Inc.

Cc: Steve Hackett
John Ericksen

I have read, understand and voluntarily agree to the above employment terms and conditions:

_____                 Date: _____

Martin Quigley

Page 2 of 2

EXHIBIT B



July 22, 2014


Mr. Martin Quigley
242 State Street
Unit D
Portsmouth, NH 03801


RE:   *"Additional Terms and Conditions of Employment/Agreement Letter" sent via email in February 2014 to mquigley@wyman.com – Release from "Employment Probationary Period"*

Dear Martin,

Accompanying your original offer of an employment send to you in February was a further letter of agreement, which PCC Structurals, Inc. (the "Company") asked you to acknowledge and sign. This agreement spelled out additional terms of your employment, which in effect placed you in a "probationary period" to be reviewed on or before August 1, 2014.

The purpose of this letter is to release you from these additional terms and conditions of your six-month probationary employment period with the Company. In other words, you have met the added terms and conditions of your employment, and we congratulate and recognize you on your accomplishment.

Our expectation, however, remains the same. In your current capacity, like any other employee, we expect you to abide by the Company's Code of Conduct, in addition to meeting the job duties and responsibilities set to you by your President, Kevin Stein.


Sincerely,

Chuck Zwick
VP of HR
PCC Structurals, Inc.


Page 1 of 1

EXHIBIT C

 **Structurals, Inc.**

December 10, 2014

PERSONAL AND CONFIDENTIAL

Mr. Martin Quigley
242 State Street, Apt D
Portsmouth, NH 03801

Re:     Employment Decision

Dear Martin:

As you are aware, PCC conducted an internal investigation into suspected violations of the probationary agreement you agreed to when you joined PCC Structurals, Inc. in March 2014. A copy of your probationary agreement is enclosed. Steve Hackett, John Ericksen and I have reviewed the results of the investigation conducted by PCC's Chief Compliance Officer, Emi Donis. We have reviewed and considered the results of that investigation, including what you told us during our telephone call on November 5, 2014.

Based on the results of the investigation, we have decided to end the employment relationship. We have lost confidence in your ability to be a reliable and trustworthy senior executive at PCC Structurals, Inc. You held a critical position in the Company as the Vice President of Sales & Marketing, reporting directly to the company President (currently Steve Hackett). As you know, these concerns initially arose in your employment in the PCC Forged Products division and formed the basis for your probationary agreement when you moved over to the Structurals division. We were hopeful your performance and conduct at Structurals would put these concerns behind us. I thought that had occurred when I granted on July 22, 2014 your specific request to be relieved of the probationary status one week before the six months ran on August 1, 2014.

However, less than thirty days later you failed to show up for work on August 18, 2014 in Portland, with no explanation and without returning telephone calls or emails, causing us to worry about your well-being. Thereafter and during your leave of absence when others were covering your job responsibilities, issues surfaced indicating you may have violated the terms of your probationary status and continued employment. An internal investigation was commenced to determine if these violations had in fact occurred. We discussed the subject of the investigation initially with you on November 5, 2014. The internal investigation has now been completed and the results are as follows:

Mr. Martin Quigley
Page 2 of 5

1. Paragraph 3 of your probationary agreement required you to "accurately represent your role with customers and PCC employees." Specifically, the agreement stated "To be clear, you are responsible for PCC Structurals Castings Sales and nothing else until that is changed explicitly and in writing by either Kevin Stein or Steve Hackett."

   The investigation revealed that in meetings with customer GKN in Sweden in March 2014 and with customer Avio on July 10, 2014, you described a new "components group" organizational structure at PCC that would encompass the Structurals, Airfoils, CFW and Forgings divisions of PCC. You went on to represent to customers and in the presence of other PCC employees that you were slated to become the Executive Vice President of Commercial for the newly formed division. Employees Jason Wood and Rafi Balta were both present and witnessed you making these representations to major customers. Mr. Balta even asked you afterwards if you had authority to say such things and you did not answer him. Both Mr. Wood and Mr. Balta were surprised and confused by your announcements.

   We checked with Kevin Stein and Steve Hackett and confirmed that you had no authority whatsoever to make such representations. When John Ericksen and I asked you about this during our November 5, 2014 call, you acknowledged that you had made such representations to other customers including Snecma and possibly Honeywell, but that others had done so also. You specifically named Herb Sherwood and Rafi Balta. We checked with both of these employees and they adamantly denied ever making such representations. The investigation determined that you were not honest to John and me when you made these assertions against Mr. Sherwood and Mr. Balti.

   Describing a major organization restructure to key customers of Structurals and PCC employees with no authority to do so not only calls into question your trustworthiness and good judgment but is also a direct violation of paragraph 3 of your probationary agreement. Your only explanation was that other employees had done it too, which we confirmed was simply untrue.

2. Paragraph 5 of your probationary agreement required you to communicate with Kevin Stein before all customer visits to remain calibrated with his direction at all times. The Agreement further expressly instructed you to not step outside the authority Kevin Stein gave you without his prior approval.

   On July 31, 2014, you had a telephone call with customer Parker Hannifin (Jim Deasey and Frank Thompson) and asked Mr. Deasey if $500,000 was too high or too low in discussing how to resolve a commercial dispute involving the Carson City, Nevada facility from the summer/fall of 2013. Mr. Deasey told you the

Mr. Martin Quigley
Page 3 of 5

amount was too low.  You replied that you would take his response back to management.

Thereafter, while you were on leave, Holly Brauch and Jamie Clifton met with Jim Deasey to discuss the dispute.  To their shock and surprise, Ms. Brauch and Mr. Clifton heard from Jim Deasey that you had mentioned the figure of $500,000 to resolve the dispute.  You had no authority whatsoever to mention this figure, as the Company position has been, and continues to be, to offer nothing.  Your mention of this high figure to Parker Hannifin created problems and damaged the Company's relationship with this customer, as they now view the Company as backtracking from a previous solution offered by you.

The investigation into this matter included direct interviews with Jim Deasey, Holly Brauch, Jamie Clifton, Aaron Johnson and Kevin Stein.  Mr. Deasey confirmed what you had told him as described above.  Mr. Stein and Mr. Johnson confirmed that they never gave you authority to offer or mention any amount of money to Parker Hannifin.  An email review also confirmed that you received an email from Aaron Johnson on July 10, 2014 that expressly stated "Our goal is to pay nothing and maintain the relationship."  This July 10 email also contained Mark Slaughenhoupt's email to Jim Deasey on February 10, 2014 stating "I do not believe Parker is due compensation from PCC."  Kevin Stein's email to those involved in the matter on June 13, 2014 stated "Anything above $0 is going to be a problem."

Thus, notwithstanding the Company's clear position that no payment was due Parker Hannifin, you, without authority, asked Jim Deasey and Frank Thompson at Parker Hannifin if $500,000 was too high or too low.  Mr. Deasey told us he took this as you fishing to see if $500,000 would settle the dispute.  As you know, John Ericksen and I also asked you about this issue on November 5, 2014.  You acknowledged that you had used the figure in your discussion with Jim Deasey and Frank Thompson but it was not a firm settlement offer.  As an experienced and sophisticated sales executive, you know that mentioning such a high dollar figure to an important customer leaves the impression that the Company is willing to pay a material amount to settle a dispute, which the Company was not in any position to do.  This is a direct violation of paragraph 5 of your probationary agreement and demonstrates extremely poor judgment on your part.

In recent preparations to meet with Parker Hannifin to continue efforts to resolve the commercial dispute, we further learned that you shared inappropriate internal documents with Jim Deasey regarding the internal costs to Structurals resulting from the subject matter of the dispute.  Again, we confirmed with Aaron Johnson that you had no authority to share such documents with the customer and you exercised very poor judgment in doing so.

Mr. Martin Quigley
Page 4 of 5

3. During the investigation it was revealed that you had deleted substantially all of
   your emails shortly before you left for vacation on August 5, 2014. Specifically, we
   could not locate any emails from the beginning of your employment at Structurals
   in early March 2014 through to August 5, 2014, when you went on vacation and
   then failed to return to work on August 18, 2014 in Portland. We find this deleting
   of all company emails to be very concerning and troubling. We wanted to ask you
   about this during the investigation but you refused to talk with us. Instead, after our
   discussion on November 5, you obtained legal counsel, would not speak with us
   directly and then refused to make yourself available to be interviewed (even with
   your counsel present).

   There is no business reason or need for a Structurals sales executive to delete all
   company emails (including incoming and outgoing emails, email folders, etc.) on
   his company computer before leaving for vacation. This can create serious business
   issues with no record of your past communications and nothing to reference while
   you are away. We did briefly check for the existence of emails while you were
   employed by the Forged Products division and found that you had not deleted all of
   your emails while employed there. We find it very troubling that you felt it
   necessary to delete all of your emails at Structurals.

4. From November 10, 2014 through December 3, 2014, PCC's internal investigator,
   Emi Donis, repeatedly requested an interview with you regarding your actions.
   Ms. Donis agreed to allow your attorney to be present during the interview.
   Despite numerous invitations, you failed to cooperate in the investigation and make
   yourself available to answer questions and provide whatever information you
   wanted to share with Ms. Donis. As conveyed to your legal counsel on December
   2, 2014, the PCC Code of Conduct expressly states that "Misconduct that may result
   in discipline or termination includes: ... Failing to cooperate in an investigation
   conducted by PCC, its customer or a government agency." (See page 27 of the PCC
   Code of Conduct, available on the PCC website). Your failure to cooperate and
   make yourself available to be interviewed has been taken into consideration in this
   employment decision.

Refusing to cooperate, deleting all workplace email communications, misrepresenting
organizational structure changes to customers and employees, and making high dollar
settlement overtures without any authority to do so does not demonstrate that you are a
reliable and trustworthy individual who can succeed at Structurals and PCC. As you know,
these were the very concerns that caused you to join Structurals under a strict probationary
agreement.

You were expressly warned in the probationary agreement that the employment terms and
conditions in the Agreement were generated in response to your performance history in the
Forged Products division and that PCC has a zero-tolerance policy applied to any

Mr. Martin Quigley
Page 5 of 5

recurrence of these issues.  Despite this, you continued to commit the same violations that
your probationary agreement was designed to correct.  As a result, we have lost confidence
in your ability to be a reliable and dependable employee who will operate within the rules
and boundaries provided to you and with the integrity that never compromises PCC's high
ethical standards.

As we are ending the employment relationship, we need you to promptly return all
company property including your company-issued laptop, cell phone, office keys, ID
badge, company credit card, and all proprietary and confidential documents belonging to
any PCC-owned company including Structurals and Forged Products.  Please contact us, or
have your attorney contact us, to promptly return these important company assets.

Sincerely,

Chuck Zwick
Vice President of Human Resources
PCC Structurals, Inc.

Enclosure
cc:    Mr. Steve Hackett
        Mr. John Ericksen
        Mr. Joseph R. Russell, attorney for Mr. Quigley



Mr. Martin Quigley
*Sent via email to mquigley@wyman.com*

Dear Martin,

The purpose of this letter is to set forth the terms and conditions of your six-month probationary employment period with PCC Structurals, Inc. (the "Company") to begin on March 3, 2014 and end on August 1, 2014. At the conclusion of this period, you understand and agree that the Company will decide in its sole discretion whether to continue or terminate the employment relationship. Notwithstanding this six-month probationary period, you further acknowledge and agree that you are employed by the Company at all times on an at-will basis, meaning that the Company or you may end the employment relationship at any time, for any reason or no reason, and with or without prior notice. The terms and conditions of your probationary employment are as follows:

<u>Job Duties and Responsibilities:</u> Your work time will be split between customer visits, the Millbury office and at least one week each month in Portland. The initial scope of your position covers the Structurals Castings Division only as its Commercial Director. You are expected to collaborate appropriately with other related PCC operations, but they do not report to you. During this six-month period the focus needs to be on learning the people and products of the Structurals Castings plants. The scope of your position will be reviewed on or before August 1, 2014.

<u>Additional Terms and Conditions of Employment:</u> The following additional terms and conditions must be strictly adhered to at all times during your employment. Failure to comply is grounds for immediate termination.

1) All of you expense reports are to be turned into Chuck Zwick, the Company VP of HR. All domestic air travel is to be coach, and international travel will be business economy. Only in the event that business economy is unavailable, are you authorized to use standard business class (and you must submit proof of the unavailability of business economy with your expense report (e.g., an email from Uniglobe)). All travel is to be booked through Linda Sanderski at Uniglobe. Hotel choices, restaurant selections, ground transportation choices and additional days/weekends taken for travel will all be factors that are closely scrutinized by the Company. You will be held to comply with the prudent spending behaviors consistent with PCC culture. Should non-work days be included in business trips you will not charge the Company for your expenses on those days and you will use vacation time for any work week days ( Monday – Friday) you are not working or traveling.

2) You will refrain from all inappropriate personal conversations with coworkers and subordinates. Over-sharing of your own detailed personal matters has made other PCC employees very uncomfortable and this activity will cease immediately.

3) You will accurately represent your role with customers and PCC employees. To be clear, you are responsible for PCC Structurals Castings Sales and nothing else until that is changed explicitly and in writing by either Kevin Stein or Steve Hackett. You are expected to assist Carlton Forge

Page 1 of 2

Works and any other PCC-owned companies as requested and without debate over reporting relationships.

4) You will not engage in any recruiting activity directly and in particular from any former employer. You will turn over all recruiting activities to either Chuck Zwick for Structurals Castings candidates; or John Ericksen for candidates that might fit elsewhere at PCC. Any referral of talented candidates should be provided to Chuck Zwick or John Ericksen and must not violate any contractual obligation.

5) You will communicate with me before all customer visits to remain calibrated with my direction at all times and you will not step outside of the authority I give you without my prior approval.

6) You will re-read the PCC Code of Conduct prior to March 3rd and by your signature below, you acknowledge your understanding that 100% compliance with the PCC Code of Conduct is non-negotiable and a firm condition of continued employment. You must pay particular attention to, and strictly comply with, the section of the Code that addresses PCC's intellectual property.

These employment terms and conditions have been generated in response to your performance history in the Forged Products Group. It is imperative that you carefully read these employment terms and conditions, and fully understand and agree to a zero-tolerance policy applied to any recurrence of these items or any items that in the judgment of PCC compromises our high ethical standards.

Sincerely,

Kevin Stein
President
PCC Structurals, Inc.

Cc:  Steve Hackett
     John Ericksen

I have read, understand and voluntarily agree to the above employment terms and conditions:

Martin Quigley                                    Date: 2/24/14

STATE OF NEW HAMPSHIRE

ROCKINGHAM, SS.                                        SUPERIOR COURT

MARTIN T. QUIGLEY

v.

PRECISION CASTPARTS CORP., WYMAN-GORDON INVESTMENT CASTINGS, INC.,
PCC STRUCTURALS, INC., KENNETH BUCK, EMI DONIS, JOSHUA DURAND,
JOHN ERICKSEN, BRIAN KEEGAN, KEVIN STEIN, MICHAEL WALTER,
CHARLES ZWICK AND DOE DEFENDANTS 1 THROUGH 10

Docket No. 218-2016-CV-00015

**ACCEPTANCE OF SERVICE**

The undersigned, as attorney for Defendants Precision Castparts Corp., Wyman-Gordon

Investment Castings, Inc., PCC Structurals, Inc., Kenneth Buck, Emi Donis, Joshua Durand,

John Ericksen, Brian Keegan, Kevin Stein, Michael Walter, and Charles Zwick, hereby accepts

service of the Complaint filed January 6, 2016 with attached Summons in a Civil Action in the

above matter and waives all formalities in connection with formal service thereof.

Defendants do not waive other defenses to which they may be entitled.

JACKSON LEWIS P.C.,

Date:  February / / , 2016                    By:  _____
                                                   Debra Weiss Ford
                                                   NH Bar No. 2687
                                                   100 International Drive, Suite 363
                                                   Portsmouth, NH 03801
                                                   603.559.2727
                                                   debra.ford@jacksonlewis.com

4837-1405-7256, v. 1