```
                UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEW HAMPSHIRE
```

**Martin T. Quigley**

    **v.**                                      Case No. 16-cv-90-PB
                                                         Opinion No. 2016 DNH 116

**Precision Castparts Corp., et al.**

**MEMORANDUM AND ORDER**

In January 2016, New Hampshire resident Martin Quigley filed a lawsuit in New Hampshire state court against his former employer, Precision Castparts Corp., an Oregon corporation.[1] Along with Precision, Quigley named a host of other defendants, including two of Precision's subsidiaries, eight named individuals, and ten unnamed "Doe Defendants." Relevant here, all of these defendants reside outside New Hampshire except one: Joshua Durand, the Bow, NH-based Human Resources Manager of Precision subsidiary PCC Structurals, Inc.

---

[1] Quigley appears to have worked at various times for Precision Castparts, Wyman-Gordon Investment Castings, Inc. (Wyman), and PCC Structurals, Inc. (Structurals), all named defendants here. See Doc. No. 1-1 at 4-9. According to the complaint, Wyman and Structurals are "wholly owned subsidiar[ies]" of Precision. Id. at 4-5. For simplicity, I refer to the corporate and individual defendants as "Precision" in this order, except where specified.

In March 2016, Precision removed the case to this court, invoking the court's diversity jurisdiction.[2]  See 28 U.S.C. §§ 1332 (diversity); 1446 (removal).  It noted that "all corporate and individual defendants, with the sole exception of Durand, are citizens of different states."  Doc. No. 1 at 2.  Precision argued that Durand's presence in the suit did not destroy diversity jurisdiction because there was "no reasonable possibility that the state's highest court would find that the complaint states a cause of action against [Durand]."  Id. (citing Universal Truck & Equip. Co. v. Southworth-Milton, Inc., 765 F.3d 103, 108 (1st Cir. 2014)).  The next month, Quigley moved to remand the case to state court.  Doc. No. 8.

## I.   BACKGROUND

### A.   Quigley's Lawsuit

Quigley asserts a variety of state law claims related to his prior employment at Precision and two of its subsidiaries, Wyman-Gordon Investment Castings, Inc. (Wyman) and PCC Structurals, Inc. (Structurals).  He alleges that he was

---

[2] Removal appears to have been timely, since the notice of removal was filed within 30 days of Precision's receipt of service of the complaint.  See 28 U.S.C. § 1446(b).  The defendants also appear to have unanimously consented to removal.  See Doc. No. 1 at 1; see also Esposito v. Home Depot U.S.A., Inc., 590 F.3d 72, 75 (1st Cir. 2009) (discussing the requirement of defendant unanimity in removal cases).

subjected to a hostile environment while working as the Vice President of Sales at Wyman's Cleveland facility from April 2012 to March 2014.  Doc. No. 1-1 at 6.  Quigley eventually requested a transfer to Wyman's location in Millbury, MA.  Id.  Rather than accommodate his request, however, Precision allegedly forced Quigley to undergo "internal interviews and testing" before reassigning him in March 2014 to Structurals' Tilton, NH facility under a six-month probationary agreement.[3]  Id. at 6-7.

Quigley claims that he was "routinely coerced into partaking in business practices that he found unethical and illegal" throughout his tenure at Precision.  Id. at 7.  For example, Quigley alleges that Precision engaged in "extortion of customers, sale of unqualified products, insurance fraud and price fixing schemes."  Id.  According to Quigley, Precision executives condoned verbal and physical abuse towards Quigley as

---

[3] The complaint does not describe in any detail the corporate structure linking Precision – ostensibly the parent company – to Wyman and Structurals, both of which are Precision's "wholly owned subsidiar[ies]."  See Doc. No. 1-1 at 4-5.  Nor do the parties discuss the significance, if any, of Precision's corporate structure to this case.  Cf. United States v. Bestfoods, 524 U.S. 51, 61 (1998) (Souter, J.) (Noting that "[i]t is a general principle of corporate law . . . that a parent corporation . . . is not liable for the acts of its subsidiaries"); but see Chicago, M. & St. P. Ry. Co. v. Minneapolis Civic & Commerce Ass'n, 247 U.S. 490, 501 (1918) (allowing piercing of the corporate veil when a subsidiary is "used as a mere agency or instrumentality of the owning company").

a part of Precision's "culture" as a "full contact company." Id. at 8.

Due to the hostile work environment he was forced to endure, Quigley soon began suffering from high levels of stress and anxiety. Id. In July 2014, his doctors recommended a six-month leave of absence and advised him to avoid stressful environments. Id. The next month, Quigley contacted defendant John Erickson, a Senior Vice President at Precision, to discuss his health issues and request a leave of absence. Id. at 9. Erickson assured Quigley that he would only share information about Quigley's health issues with other senior executives and human resources personnel, but to Quigley's dismay, Erickson and other unnamed defendants disclosed his health information to "other employees, to customers, and to others in the aerospace industry." Id. This disclosure humiliated Quigley and impeded his ability to find other employment at a similar level of compensation. Id.

During this period, Quigley continued to pursue a leave of absence. Defendant Brian Keegan, Precision's Senior Corporate Director of Employee Relations, told Quigley that, among other things, he qualified for six months of disability coverage through the health insurer Cigna. Id. Quigley began filling out paperwork for Cigna and invested "large amounts of time and

money" in the process.  Id.  At some point, however, he was told that the "Corporate Defendants, Defendant Durand, and Defendant Keegan, had all misinformed [Quigley] about [his] eligibility for coverage."  Id.  Cigna then denied his coverage.  Id.  This "two-month long process" caused Quigley "further emotional and physical distress and significant out-of-pocket expenses."  Id.

In addition to misleading Quigley about his disability coverage, the "Defendants . . . jointly decided to conduct a sham investigation" to force him from his job.  Id. at 10.  According to Quigley, this "sham investigation" served as a "pretext for their firing" him.  Id. at 11.  In November 2014, Quigley was placed on unpaid leave status pending "investigations into suspected violations of his probationary agreement," and the next month, Quigley's employment was terminated.  Id. at 10-11.

In January 2016, Quigley filed this lawsuit, bringing ten claims under New Hampshire law.  Not all claims are directed at each defendant; some apply to various corporate defendants, others to "All Defendants."  See id. at 11-16.  Quigley asserts only four claims against Durand: breach of fiduciary duty, civil conspiracy, intentional infliction of emotional distress, and negligent infliction of emotional distress.  See id. at 13-16.

B.  **Facts Relevant to Durand**

Durand is only briefly mentioned in the complaint.  He is listed as one of several individual defendants, along with his Bow, NH address and role as Structurals' Human Resource Manager.  Id. at 5.  Later in the complaint, Quigley alleges that "Defendants" – including, presumably, Durand – improperly disclosed his confidential health information to employees, customers, and others in the aerospace industry.  Id. at 9.  He argues in a memorandum supporting his motion that Durand's position as Human Resource Manager gave him access to Quigley's health information, and Durand breached his duty to keep that information private.  See Doc. No. 8-1 at 2.

Quigley further explains that "Defendant Durand" and other Precision administrators "misinformed" him about his eligibility for disability coverage under Cigna's policy.  Doc. No. 1-1 at 9.  This misinformation caused him to undergo an "expensive, stressful, and ultimately futile two-month long process," which led to "further emotional and physical distress and significant out-of-pocket expenses."  Id.  Finally, Quigley claims that the "Defendants" – again, presumably including, but not naming, Durand – "jointly decided to conduct a sham investigation to force [Quigley] from his job and prevent him from becoming a whistleblower."  Id. at 10.  Because Durand was Structurals'

6

Human Resource Manager, Quigley argues, Durand "was in a position to participate in said civil conspiracy to accomplish the object of unlawfully terminating [Quigley's] employment, either directly or indirectly."  Doc. No. 8-1 at 5.  Beyond these allegations, Quigley does not make any further reference to Durand.

In its opposition to Quigley's motion to remand, Precision filed an affidavit from Durand.  Doc. No. 9-2.  In that affidavit, Durand alleged that his office in Tilton did not maintain Quigley's medical records.  Id. at 2.  He noted that he did not review Quigley's medical records in connection with Quigley's leave of absence, and never disclosed anything about Quigley's health to anyone inside or outside the company.  Id.

With respect to the company's disability policy with Cigna, Durand alleged that Precision executive Brian Keegan asked him to provide Keegan with a copy of the policy.  Id.  Durand complied.  Id.  According to Durand, he made no representations to Quigley about his eligibility for disability benefits and was not responsible for assisting Quigley in receiving benefits.  Id.  Finally, Durand alleged that he had no discussions about Quigley's termination; was not aware of any investigation conducted against Quigley; and never agreed to "act in concert" with anyone conducting a "sham investigation."  Id. at 3.

## II. **ANALYSIS**

Quigley's motion to remand turns on whether he properly joined Durand as a defendant when he filed his state court complaint.

A defendant may not remove a case to federal court unless the court has subject matter jurisdiction to consider the case. See 28 U.S.C. § 1441; Mills v. Harmon Law Offices, P.C., 344 F.3d 42, 45 (1st Cir. 2003). Here, jurisdiction is based on the diversity of citizenship statute, which ordinarily requires that "the citizenship of each plaintiff is diverse from the citizenship of each defendant." Caterpillar Inc. v. Lewis, 519 U.S. 61, 68 (1966) (emphasis added); see 28 U.S.C. § 1332(a). An unflinching application of the complete diversity requirement, however, would allow any plaintiff who wanted to keep a case in state court to defeat the removal of an otherwise diverse case merely by adding bogus claims against a nondiverse defendant. To address this problem, courts developed the doctrine of "fraudulent joinder," which permits courts to disregard the citizenship of a fraudulently joined defendant when determining whether diversity of citizenship exists. See 13F Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Fed. Prac. & Proc. Juris. § 3641.1 (3d ed. 2009).

Although fraudulent joinder can be proved with evidence that "there has been outright fraud in the plaintiff's pleading of jurisdictional facts," Jenner v. CVS Pharmacy, Inc., 2011 WL 1085981, at *1 (D.R.I. March 22, 2011), it can also be established by a showing that "there is no reasonable possibility that the state's highest court would find that the complaint states a cause of action upon which relief may be granted against the non-diverse defendant,"[4] Universal Truck & Equip. Co., 76 F.3d at 108. Precision does not claim that Quigley acted with fraudulent intent in pressing his claims against Durand. Instead, Precision asserts that Durand was improperly joined because there is no reasonable possibility that the New Hampshire Supreme Court would find that Quigley has stated a viable claim against him. When evaluating this argument, I "must necessarily look to the pleadings standards applicable in state court, not the plausibility pleading standards prevailing in federal court." Stillwell v. Allstate Ins. Co., 663 F.3d 1329, 1334 (11th Cir. 2011).

---

[4] The term "fraudulent joinder" has been characterized as "something of a misnomer" because it does not necessarily require a removing defendant to "prove that the plaintiff intended to mislead or deceive." Lawrence Builders, Inc. v. Kolodner, 414 F. Supp. 2d 134, 137 (D.R.I. 2006); Grennell v. W. S. Life Ins. Co., 298 F. Supp. 2d 390, 394 (S.D.W. Va. 2004). As a result, some courts employ the term "improper joinder" instead. See, e.g., African Methodist Episcopal Church v. Lucien, 756 F.3d 788 (5th Cir. 2014).

In determining whether a complaint states a viable claim for relief, a New Hampshire state court must "rigorously scrutinize the complaint to determine whether, on its face, it asserts a cause of action." Jay Edwards, Inc. v. Baker, 130 N.H. 41, 44-45 (1987). All properly pleaded allegations are assumed to be true and all reasonable inferences that can be drawn from the allegations are construed in the light most favorable to the plaintiff. Snierson v. Scruton, 145 N.H. 73 76-77 (2000). In the end, if the pleadings "are reasonably susceptible of an interpretation that would permit recovery," the case should not be dismissed. Id.

Quigley asserts claims against Durand for breach of fiduciary duty, civil conspiracy, intentional infliction of emotional distress, and negligent infliction of emotional distress. See Doc. No. 1-1 at 13-16. All four claims are based on Quigley's contentions that Durand, either on his own or in concert with others, (1) improperly disclosed Quigley's confidential health information to the public; (2) supplied Quigley with misleading information about his eligibility for disability benefits; and (3) conducted a "sham investigation" into his work that ultimately served as a pretext for his termination. See id. The problem with all of these contentions is that Quigley does not plead sufficient facts in support of

his claims to justify anything other than a purely speculative conclusion that Durand was a culpable participant in any wrongdoing.

Quigley alleges that Durand was "the Human Resource Manager" of Structurals, the Precision subsidiary where Quigley worked immediately prior to his dismissal. Id. at 5. He also claims that "the Corporate Defendants, Defendant Durand and Defendant Keegan, had all misinformed Plaintiff about Plaintiff's eligibility for coverage under the Cigna disability policy." Id. at 9. To the extent that Quigley otherwise alleges wrongdoing by Durand, he does so only with conclusory allegations that "Defendants" as a group committed the acts that give rise to his claims. See generally id. at 3-11. In a memorandum he filed in support of his motion to remand, Quigley then argues that it is reasonable to conclude that Durand was a culpable participant in the defendants' alleged misconduct because of his position as Structurals' Human Resource Manager. See Doc. No. 8-1 at 4.

I am unpersuaded by Quigley's argument. To state a viable claim against Durand under New Hampshire law, Quigley must do more than merely assert that he was mistreated at his workplace and that Durand must have been involved because he served as the Human Resource Manager of a Precision subsidiary. Although

11

Quigley claims that Durand is liable for breach of fiduciary duty for leaking Durand's confidential medical information, he fails to cite any fact other than Durand's job title to support his claim that Durand either leaked the information himself or was a culpable participant in leaking by others.  He similarly claims that Durand participated in a conspiracy to use a "sham investigation" to force his termination but supplies no supporting facts that would justify his claim that Durand was a culpable participant in the conspiracy.  Quigley does not identify the specific conduct that supports his intentional and negligent infliction of emotional distress claims against Durand, but to the extent that the claims are based on a contention that Durand supplied misleading information to Quigley about his eligibility for disability benefits, it does not come close to alleging conduct by Durand that is sufficient to support either claim.  Cf. Tessier v. Rockefeller, 162 N.H. 324, 341-42 (2011) (requiring "extreme and outrageous conduct" to state a claim for intentional infliction of emotional distress and, among other things, "serious mental and emotional harm accompanied by objective physical symptoms" to state a claim for negligent infliction of emotional distress).

　　Accordingly, even under the liberal pleading standards that prevail in New Hampshire state courts, there is no reasonable

possibility that the New Hampshire Supreme Court would find that Quigley has stated a viable claim against Durand.  I therefore agree with Precision that Durand should be dismissed as a defendant and that Quigley's motion to remand should be denied.

### III.   CONCLUSION

In sum, Precision has met its burden of showing that Quigley's joinder of Durand was improper.  Accordingly, I deny Quigley's motion to remand (Doc. No. 8), dismiss Durand from the suit, and retain jurisdiction over the case.  See Johnson v. Am. Towers, LLC, 781 F.3d 693, 704 (4th Cir. 2015) (allowing district courts to "disregard, for jurisdictional purposes, the citizenship of certain nondiverse defendants, assume jurisdiction over a case, dismiss the nondiverse defendants, and thereby retain jurisdiction").

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

July 14, 2016

cc:   Earl Kalil, Jr., Esq.
      William Saturley, Esq.
      Joseph Russell, Esq.
      Debra Weiss Ford, Esq.
      Martha Van Oot, Esq.